Rockingham
No. 86-143

*In re* Two Hundred Seven Thousand Five Hundred Twenty-Three Dollars and Forty-Six Cents in United States Currency; Approximately One Thousand Nine Hundred Fifty-Six Pre-1964 Silver Quarters; Ten Fifty-Dollar Canadian Gold Pieces; Fifty-Five One-Ounce Gold Krugerrands; Forty-Three Twenty-Dollar Gold Coins; One Ten-Dollar Gold Coin; One Five-Dollar Gold Coin; Five Hundred and Seventy-Seven Silver Dollars; and Eighteen Silver Half Dollars

December 31, 1987

*Stephen E. Merrill,* attorney general (*Brian T. Tucker,* associate attorney general, and *Steven L. Winer,* assistant attorney general, on the brief, and *Mr. Tucker* orally), for the State.

*Steven M. Gordon,* of Concord, and *Cullen & Wall,* of Boston, Massachusetts (*Robert V. Carr* and *Albert F. Cullen, Jr.,* on the brief, and *Mr. Cullen* orally), for the party in interest, Stephen D. Young.

SOUTER, J.   The party in interest, Stephen Young, brings this appeal from a decree of the Superior Court (*Gray,* J.) ordering the captioned moneys forfeited to the State under RSA 318-B:17-b, on grounds of their use or intended use in furthering violations of the controlled drug act. Young claims that the evidence was insufficient to prove all elements necessary for forfeiture, and argues that the proceeding was barred both by the statute of limitations and by legal and constitutional standards requiring prospective application of the forfeiture statute. We affirm.

The case reaches us as a companion to *State v. Valenzuela & a.,* decided today, and we refer to our opinion in the criminal case for the facts linking Young to his co-defendants, Valenzuela and DiMatteo, in a sophisticated scheme to distribute controlled drugs in violation of RSA chapter 318-B. Here we pay particular attention to the evidence seized in the January, 1984, searches of the three defendants' dwellings.

Valenzuela's house yielded a number of firearms, thirty pounds of cocaine, and some nineteen hundred pounds of marijuana. A ledger found on Valenzuela's person accounted for the marijuana, and an identical ledger was found at Young's house.

The search of DiMatteo's house produced another thirty five pounds of cocaine and detailed notebooks accounting for the prior distribution of thirty-eight and one-half kilograms of cocaine. Entries in these records and in ledgers in Young's possession were readily subject to cross reference.

In searching Young's house, the police found implements used to prepare cocaine for sale and consumption, a small quantity of the drug itself, and nineteen pounds of marijuana, later determined to have come from the shipment found at Valenzuela's house nearby. Young's ledgers revealed the information to which we have already referred and further disclosed sales of at least 49,564 grams of cocaine to sixteen different buyers, at prices totalling $3,195,210. Notes hidden with the ledgers indicated that the cocaine supplied to Valenzuela, DiMatteo, and Young came from one "Cuchaco," who had sent them at least one hundred forty pounds of it at $28,000 per kilogram. The notes referred to a payment by Young to Cuchaco of $500,000 on November 1, 1983, against a balance of $1,764,000 then owed.

The search of Young's premises also yielded the moneys subject to this *in rem* proceeding: $35,020 in cash hidden in a brown paper bag in the bathroom; $3,960 in cash in an envelope on a bureau in Young's bedroom; another $4,000 in cash on top of the same bureau; $93,900 in cash located in a hidden compartment between the kitchen and dining room; 45 individually wrapped gold coins in Young's office over the garage; 577 silver dollars and 18 silver half dollars in a box in a second office over the garage; two jars of mixed coins totalling $190.50 in a wine vault; 1,956 pre-1964 silver quarters in three canisters over the garage; and in a safe buried underground near Young's house, $67,400 in currency, $184.55 in mixed coins, $49.66 in United States mint proof sets, $5.00 in silver dollar sets, $100 in silver dollars, and a total of $2597.75 in Susan B. Anthony dollars. (How dollar coins can yield a fractional total of .75 is beyond us; but so the record reads.) Finally, the police seized 35 Franklin half dollars from Young's safe deposit box.

On February 13, 1984, the attorney general petitioned the superior court on the State's behalf for an order that the moneys be forfeited as having been knowingly used or intended for use in the procurement, delivery or distribution of a controlled drug in felonious violation of RSA chapter 318-B. *See* RSA 318-B:17-b, I(c) and IV. The petition recited the circumstances under which the moneys had been seized, and it alleged that the search of Young's premises also turned up books instructing how money could be laundered by conversion into old coins and other collectible objects.

Young responded by raising a series of defenses which proved to be of no avail. This appeal incorporates by reference Young's challenges to the constitutionality of the search, which we have resolved favorably to the State in the companion case. *See Plymouth*

*Sedan v. Pennsylvania,* 380 U.S. 693 (1965) (derivative contraband may not be forfeited if seized in violation of fourth amendment, since proceeding is penal and quasi-criminal in nature); *cf. United States v. $250,000 in United States Currency,* 808 F.2d 895, 900 (1st Cir. 1987) (for purposes other than fourth and fifth amendments, such forfeiture proceedings are treated as civil). We deal now with the remaining issues going to the elements necessary for forfeiture, the statute of limitations, and the legal and constitutional prohibitions against *ex post facto* laws.

Young's principal argument, challenging the sufficiency of the State's proof, raises a question about the interpretation of RSA 318-B:17-b, I(c). He starts with the assumption that the provision for forfeiture of "moneys used or intended for use" in felonious violation of the controlled drug act requires proof "connecting the [money to be forfeited] with [a] particular narcotics transaction" (Young's brief at p. 15), and in support of such a requirement, he cites *Hudson County Board of Chosen Freeholders v. Morales,* 581 F.2d 379 (3d Cir. 1978), and *State of New Jersey v. Kaiser,* 476 F.2d 610 (3d Cir. 1973). He then argues that the State's evidence was inadequate to establish any such connection, without which the order of forfeiture was erroneously issued.

We will assume that Young is correct about the state of the evidence. He is wrong, however, about the state of the law. His first mistake is in citing *Hudson County* and *Kaiser* as establishing a general rule for the third circuit that money is not subject to forfeiture unless it can be tied to a specific illegal transaction. Neither case so holds.

*Hudson County* adjudicated the federal government's demand to enforce a tax lien against certain money that the State of New Jersey claimed by antecedent right of forfeiture. The State's claim rested on the common law doctrine that a defendant may not retain the fruits of a specific crime that he has committed. *See State v. Sherry,* 46 N.J. 172, 176, 215 A.2d 536, 538 (1965). Because the State could not connect the money in question with a specific crime, the State lost under its own rule. *Hudson County, supra* at 384.

*Kaiser* similarly decided competing claims of the federal government and the State of New Jersey, the one to enforce a tax lien and the other to a forfeiture of the same money. The State claimed that the money was forfeitable as derived from gambling operations. The State lost because of the court's reliance on an earlier New Jersey case, which held that a statute providing for the forfeiture of a gambling "device" was inapplicable to money, unless the State proved that the money had been "segregated and

earmarked" for gambling purposes. *See Krug v. Board of Chosen Freeholders,* 3 N.J. Super. 22, 25–26, 65 A.2d 542, 543 (App. Div. 1949). The third circuit followed New Jersey's construction of its own statute in reasoning that the money in question was not subject to State forfeiture unless the State proved that it was "being used as an element in a gambling operation," as distinguished from a mere accumulation of gambling profits. *State v. Kaiser, supra* at 612. Therefore, neither the third circuit opinions cited by Young, nor the New Jersey cases upon which they relied, are authority for a general rule that forfeiture of money should require proof of a connection with a specific criminal transaction.

Young's second mistake consists of his tacit suggestion that the terms of the New Hampshire statute are analogous in some relevant respect to the rules of New Jersey law applied in *Hudson County* and *Kaiser.* They are not. RSA 318-B:17-b, I(c) neither conditions forfeiture on proof that the moneys are fruits of crimes, nor speaks of a "device." RSA 318-B:17-b, I(c) simply requires proof that the moneys were "used or intended for use" in felonious violation of the controlled drug act. The statute, like its similar (but not identical) federal counterpart, 21 U.S.C. 881(a)(6), is devoid of any requirement to prove connection with a specific illegal transaction. Young has advanced no reason in legislative history or policy to impose such a requirement, and we can think of no more reason to do so in construing our statute than the federal courts have done in applying § 881(a)(6). *See, e.g., United States v. Four Million, Two Hundred Fifty-Five Thousand Dollars,* 762 F.2d 895, 904 (11th Cir. 1985), *cert. denied,* 106 S. Ct. 795 (1986); *United States v. Brock,* 747 F.2d 761, 762–63 (D.C. Cir. 1984).

Perhaps we need not point out that the evidence in the instant case was more than adequate to establish by a preponderance, *see* RSA 318-B:17-b, IV, that the moneys were used or intended for use in prohibited transactions. The physical and documentary evidence revealed an elaborate scheme for selling cocaine and marijuana in such quantities as to require large amounts of cash to procure the requisite supplies. The moneys were found in proximity to drugs and to records of drug transactions, and they were kept correspondingly clear of any reflection in banking records that would have pointed to the defendant's criminal business. *See United States v. Four Million, Two Hundred Fifty-Five Thousand Dollars supra.* In these circumstances, the very quantity of the money was evidence of its illicit use and the anticipation of such use in the future. *United States v. $93,685.61 in United States Currency,* 730 F.2d 571 (9th Cir.), *cert. denied,* 469 U.S. 831 (1984).

■ From the force of this evidence Young tries two escapes. First, he proposes a distinction between the apparent bankrolls of currency and the accumulations of coins and coin sets, which he labels as a "collection." But the trial judge could find that numismatists do not normally mix their collections with bankrolls evidently kept to finance criminal transactions, and the trial court could legitimately infer that Young held the coins for the same reason he held the paper money. Second, Young suggests that the money in the buried safe was not readily available for illicit use and was therefore nothing more than provision for a rainy day, as his counsel put it in argument. The trial judge could not, however, be accused of pathological suspicion if it struck him that most thrifty savers do not choose interest-free burials as vehicles of investment. In sum, nothing compelled the trial court to ignore the quantum of evidence that the moneys were used or intended for use in felonious drug transactions.

Young's remaining issues on appeal require only brief attention. He cites RSA 616:9, which requires "[a]ll suits . . . founded upon any penal statute for . . . forfeitures [to be] brought within 2 years after the commission of the offense, unless otherwise specially provided." He argues that the statute barred this action because some of the records seized indicate drug activity more than two years before the institution of the forfeiture proceeding in February, 1984. The State responds that RSA 616:9 is inapplicable by its own terms because RSA 318-B:17-b, II provides a special statute of limitations, by its mandate to begin any forfeiture proceeding under the drug statute within thirty days of seizing the material to be forfeited.

■ We need not decide whether this position is well taken, however, because of a more obvious reason why RSA 616:9 does not control this case. RSA 318-B:17-b, I(c) does not limit forfeitures to instances in which the property has been used in the commission of an offense in the past. Property, rather, is forfeitable if shown to be "intended for use" in violation of the controlled drug act, and this was alleged in the forfeiture petition now before us. Since RSA 616:9 applies only to forfeitures based on an offense previously committed, it has no application to a forfeiture based on a demonstration of intended activity. Because the evidence was obviously sufficient to sustain the instant forfeiture on this latter ground alone, Young has not carried his burden to demonstrate that RSA 616:9 could apply to bar the action, and the trial court properly rejected his claim. *See Rines v. Rines*, 97 N.H. 55, 57, 80

A.2d 497, 498 (1951) and *Thurston v. Kennett*, 22 N.H. 151, 159 (1850).

Young's final argument rests on the 1981 effective date of RSA 318-B:17-b. He argues that the evidence is insufficient to demonstrate that the moneys were associated with drug transactions occurring after that date, with the result that any forfeiture under the statute would necessarily constitute a "retroactive" application of the statute, in violation of accepted standards of statutory construction, or an *ex post facto* application, in violation of article I, § 10 of the Constitution of the United States and part I, article 23 of the State Constitution.

■  A number of responses might be made to the several points raised, but one will suffice. As we have just explained, the State had to prove only that Young intended to use the moneys in violation of the act, and the evidence was more than sufficient to do that. The trial court was not required, therefore, even to look to a specific time in the past when the moneys might have been used or obtained.

*Affirmed.*

THAYER, J., did not sit; BATCHELDER, J., concurred specially; the others concurred.

BATCHELDER, J., concurring specially: I write separately to address the concerns raised in my dissenting opinion in the companion case, *State v. Valenzuela*, also decided today. There, I would have held that the defendants were entitled to a probable cause determination absent the fruits of the pen register search. If indeed the seizure of the property in that case was illegal, it may not here be subject to forfeiture. *See Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965) (contraband may not be forfeited if seized in violation of fourth amendment, since proceeding is penal and quasi-criminal in nature). Otherwise, I agree with the interpretation of RSA 318-B:17-b in this case.